Okay. Our next case is Wittman v. Saenz. Good morning. May it please the Court, I'm Jonathan Gaskin of Orrick, Harrington & Sutcliffe, and with me today is Jennifer Massey of Clifford Chance, and we represent appellant Charles Wittman. Counsel, would you answer a question for me, and I think that'll be very helpful. Tell me what Mr. Wittman's standing to sue is. What is his standing? I'm not married to the mother. He didn't father these children. He didn't adopt them. If I'm saying it wrong, please correct me. What standing does he have to be involved in what happens to them and their life generally? Well, Mr. Wittman doesn't at this moment have a lot of standing as to what happens to the children. What Mr. Wittman is here appealing is something that he has quite a bit of standing for, which is his denial of access to the court system by Commissioner McCarthy under his due process rights and the infringement of his right to marry and associate with his fiancée, Miss Ma, who's the mother of the children. He's not married to this woman or living in common law with her? Do you have common law in California? We do have common law in California. I believe it's seven years. And although Mr. Wittman has been living with her for a substantial portion of his life, has he held her out to be his wife because that's one of the requisites of common law marriage? I believe the time period isn't enough. Sir? I believe the time period that has passed that they've been living together isn't enough that we would even reach that. Is that a relatively new statute? It used to be in California. In the old days, you did not have – there was no such thing as common law marriage in California. I could be wrong, Your Honor. Nonetheless, he referred to in his complaint his fiancée. Yes. If I'm not mistaken. She has been his fiancée since 1998. And, in fact, the reason they have not gotten married has to do with the fact that they're worried about being married impinging upon her ability to get her children back. However, Your Honor – Let me just ask you about your access to the court claim. There's two parts to that. One, you assume that you have – that he has a constitutional right of access. And he wants to – he wanted to participate in the dependency proceedings. Is that what he wanted? What he was looking to do was to appear to speak at a juvenile court hearing at which – Dependency hearing. I believe it was a dependency hearing. Yes. Dependency. Aren't those pretty much closed? Your Honor, I think they are closed. Court rule? But I don't think that that's the important thing here. So what right does he have? He's not the parent. He doesn't have any separate court order out of the family law court. So what – as Judge Wiener said, what standing does he have to complain about not being part of that dependency proceeding? And then I'd go on from that. Even if he had standing to be there, you're complaining about actions of the commissioner. And isn't she entitled to absolute immunity? Well, those are two different issues, Your Honor. I would say that, first of all, it's not necessarily relevant what exactly Mr. Whitman was trying to do with the court. The fact is that Commissioner McCarthy put together a personal list of pro se individuals, including Mr. Whitman, and instructed the clerks to refuse any access to the court for those individuals. I can't tell you the number of times as a trial court judge, both in the state court and in the district court, that I ordered the clerk's office not to accept his – you know, not to accept the litigant's filing for a variety of reasons. Well, I can understand that, and I think that the procedure for that is normally vexatious litigant proceedings. I don't recall that I simultaneously declared the litigant a vexatious litigant. In juvenile court, you have to have some sort of basis standing to come in to that closed proceeding. I understand that the courts have gone and said some foster parents do, some grandparents do on occasion, although, if you recall, the Supreme Court has sort of limited that. Parents obviously do. I think what Judge Pius is asking is, where does just some guy – he says, well, I'm her fiancé, and so I want to be part of the juvenile court closed proceeding. Where does he have the right to come in? If he has no right to come into that proceeding, well, then we can forget about the judge part of this thing, and we can go to the maybe more interesting part. Well, Mr. Whitman had been – the proceeding we're talking about is Mr. Whitman applying to be, and in fact the social worker on the case at that time, proposing Mr. Whitman as the guardian of the child at issue. And Mr. Whitman before this had been allowed. He, in fact, was not the guardian, or the guardian ad litem, am I correct? He was not at that point, but the proceeding which he was excluded from was the proceeding at which the social worker was proposing that he be appointed guardian. And at previous proceedings for this child, he had been allowed to attend. This was the first that he was excluded from. Now, just as a quick procedural matter, because Your Honors beat me to the punch, Ms. Massey and I will be splitting the issues, and I will be addressing the judicial issues with lack of access to the courts, and she will be addressing his Section 1983 claims against the social workers for denying him the right to marry and impinging upon his right to associate with his fiancée. And we'll be splitting the time even later. If Your Honors appear to find the other area more interesting, we'd be happy to change that with whatever guidance you see fit to provide. I don't have any more questions on this issue. Maybe we should hear from the 1983 issue. The 1983 issue. Thank you. The right of association. Thank you. May it please the Court, I would like to reserve four minutes for my rebuttal. Mr. Whitman has a constitutionally protected right to marry and a protected right of intimate association with his fiancée. And I'm here to say today that the district court erred in dismissing with prejudice Mr. Whitman's Section 1983 claims against social workers Ms. Eddy and Ms. Dudley. When I read his complaint, I didn't see where he said that his complaint was that they were preventing them from getting married. I'm sorry. That was not ñ When I read his complaint, I just ñ That was actually something that we ñ He referred to her as his fiancée. Right. We amended that in his supplemental briefing. Well, I'm talking about within the complaint. Right. Well, again, Mr. Whitman is a protégé. And I realize, you know, I realize that we're obligated to read protégé complaints as generously as possible. Right. We were also told that this would be a de novo review and that we could amend the issues and frame them. Absolutely not. You cannot change the record. You can't amend the complaint when you come up to the court of appeals. You may be able to amend the briefing issues. That's right. But you can't amend the complaint. That's what I meant, our briefing. Judge Paz is saying the record doesn't show that that was made. This was a 12B6 case, right? That's right. Okay. Yes. And, in fact, Mr. Whitman did intend to marry his fiancée. They were engaged, but they ñ Well, one could assume, you know, from the term fiancée in the complaint that they were at some point intending to get married. Right. They were living together at the time. Isn't that really what his claim is about, is that somehow or other this letter that was sent by the social worker interfered with his constant First Amendment right of association to associate with his significant other person, the significant other person? Right. It's actually, yes. Isn't that really what the heart of your claim is? Well, it is. Part of the claim is a right of intimate association with his fiancée under the due process clause of the 14th Amendment, as this court has found in IDK and in other cases, and as the Supreme Court has held in Rotary and Roberts. At the same time, Mr. Whitman is fearful of marrying his fiancée as well as his fiancée is fearful of marrying Mr. Whitman because they have been instructed by the Department of Social Services through a letter from Ms. Dudley and Ms. Eddy stating that Ms. Ma has no right to associate with Mr. Whitman and that she cannot be reunited with her children until she moves from his home. So, in effect, they are forbidden from marrying. Let me ask a question. It seems to me, at least it used to be this way in the old days when I was a juvenile judge, and the laws changed a lot, but it looks like it's similar now anyway. A person is in dependency court. I take it they've been declared dependent children of the court. I don't know if that's been adjudicated or not. Typically, the courts then issue reunification plans. The reunification plan usually says, mother, you're to do A, B, C, D, and E. Let's say her husband, let's make it a husband. Let's just get really serious about it. Her husband is a child molester. The reunification plan may say, and husband shall not live in the house. Well, the problem with that ---- Wait a minute. Let me finish. The question, the question is, if the court has a reunification plan to that effect, how do you claim a constitutional violation per se in interfering with a relationship between these two people? Right. Well, your ---- the example that you've given is simply not the circumstances and the facts of this case. Mr. Whitman, there have been no allegations of abuse made against Mr. Whitman at any point in any of these proceedings, nor in the letter that was sent to his fiancée telling her that she could no longer live with him. Allegations of abuse are simply not a part of ---- He pleads that that letter is part of the information from the dependency court. Right. And it simply states that he is a poor role model. That is not ---- being a poor role model, even if that is true, that is simply no reason to violate ---- Well, I'm not going to say that the court has to say, well, given this information, I'm going to say, as part of the dependency plan, I'm not going to allow this person to be in the house. Correct? The social workers sent this letter on their own volition. They were not under the supervision of the court. This was over ---- the letter was sent actually over one year after the children had been removed from the home, when no allegations of abuse had been made against Mr. Whitman. And the letter does not state that there are any allegations of abuse against Mr. Whitman. The letter states only that they feel that he is a poor role model. Now, being a poor role model is no excuse for violating someone's constitutional rights. Ms. Ma is left in the situation where she is forced to choose between her children and potentially being able to reunite with those children or being able to continue to live in a long-term relationship. That is an unfair ---- issue a reunification plan that said these kids have had a very tough time in their lives. They've had bad role models in their lives. They've got a cuckoo for a mother. I'm not saying she is. Let's just say the court says that. They've got a cuckoo for a mother, and it would be a horrible thing to have this man who's a bad role model in the house. Are you saying the California juvenile court could not issue a plan that said unless he changes, he can't be back in that house with those kids, or we're not going to send them home? I'm not saying that at all, and those are not the facts of this case. The court never said that. This was a letter sent by two social workers who have a longstanding personal vendetta against Mr. Whitman because he is a child advocate and because he has written complaints about these two social workers. That is what this is stemming from. It's a 12B6 case. How do I know the court didn't say that? I'm sorry? How do I know that the California juvenile court has not so ruled? Well, these are all factual matters that we ask to be remanded down to the district court. In the meantime, there are no allegations. The case was dismissed with prejudice against Mr. Whitman on the basis of immunity, and we do not believe that the immunity afforded to these social workers was appropriate in this case. We are arguing that this case be remanded back to the district court and that these issues be reviewed, that this letter that was sent to Mr. Whitman that violated his rights to intimate association be reviewed. Is your claim essentially that this can't be decided on the 12B6? It really should be decided after the facts are developed? Exactly. Mr. Whitman should be allowed to engage in a discovery process back in the district court. We believe that the case was dismissed in an inappropriate manner and improperly, and we're asking that Mr. Whitman be allowed to go back to the district court and conduct discovery, be permitted to discover the e-mails and the correspondence that was taking place against him by these social workers, be able to flesh out the type of personal vendettas that were taking place. Let me ask you a few questions. You used the word immunity. Let's just assume for a moment that there is a constitutional right at stake here. We'll just assume that. Right. And we'll even assume that maybe you could point to some case that would say that it should apply in this context. I don't know which case you'd point to, but maybe there are some. I could point to many, Your Honor. Okay. Hold on. Now, you know, in the qualified immunity analysis under Katz, there are several questions that you have to answer. Even if there is a constitutional right, you get down to the next question, was it clearly established at the time of the conduct at issue here? Absolutely. Since Roberts, Your Honor. And it needs to, you know, we don't have to have a, it doesn't have to be a case just on point, but the right that you're seeking to vindicate has, we have to look at it in the context of the situation. So, one, is there a case that, is there some law in this context? And two, even if there is law, when you have, when you're in this setting with a social worker, why wouldn't, and given the concerns that Judge Fernandez has just raised, why wouldn't a reasonable social worker, why wouldn't it be reasonable for a social worker in this situation to think that when they're considering the best interest of the child to express their views about what it's going to take to complete a reunification plan? And therefore, at the bottom line, forgetting about absolute immunity and just looking at it in terms of qualified immunity, why wouldn't a social worker be entitled to qualified immunity? Well, I believe that these social workers, if they are experts in their field, they would understand in a family context that since 1984 in the Roberts case and then following with Rotary, that the right to intimate association is not limited to family situations. Otherwise, the right to intimate association would be a very black and white test, but it's not. The Supreme Court has specifically laid out a multifactored spectrum test stating that family relationships are indeed at the highest point of the spectrum and receiving the highest protection. But Mr. Whitman and his fiancee are the next closest thing, and the court has left the door open. They have specifically said in Rotary that intimate association and the rights afforded thereof are not limited to a family relationship. How about in the world of dependency proceedings? Wouldn't it be nice for these social workers to be able to, you know, look to something for some guidance? Well, again, I would think that a social worker is dealing in family situations and context all the time. They would realize that to come in and interfere with a family situation where a man and his fiancee are living together and raising these four children in their home, living together as a family, that this is something that they should take very seriously. And I do believe that they should have understood that it's clearly established that Mr. Whitman and his fiancee had a right to be living together in a home, and that to ask Ms. Ma, his fiancee, or demand of her that she can no longer associate and live with Mr. Whitman is clearly an infringement on his constitutional rights. I just simply can't imagine that in the context of being a social worker dealing in family situations. Here, they gave her the choice. Between her children and her fiancee. Yes, but he has no obligation. That is a social choice if I've ever heard one. Counsel, but he has no obligation. He's living with her, but he's not obligated to do it. And if he wanted to pick himself up and walk away, that would be the end of it. Again, he has a right to associate. He has a right. Yes, but she'd have no basis to proceed against him, for example, as a wife against a husband. They would have the right to retaliate against his fiancee and withhold her children from her. What would you do? Go into court and say he's your fiancee and he's obligated to support those children? I think after, if you were to view the record. I'm talking about from a legal standpoint. Could you make that argument on behalf of his girlfriend? On behalf of his fiancee. Yes, ma'am. Could you make that argument to a judge and he would enforce it by him having to support those children or provide a place for them to live? Mr. Whitman from the very beginning has provided a home and support to those children. He has stepped in and acted as a father figure, which I think is very admirable since 1999. Do you have cases that would support that? That would support, I'm sorry, what proposition? The argument you would make to a judge that this man is not meeting his obligations, that he's been a person who's been living with this woman. He's now decided he doesn't want to do that or they're not friends any longer, whatever that is. Could you then pour into a case to that judge and say I want you to enforce this? Well, we're really not seeking. For him to take care of these children, provide for them? Again, we understand that Mr. Whitman does not exist in a certain status with those children, but he does have a right to an intimate association with his fiancée, and she is being told that she can no longer stay with this man or stay in his home. And there was no reason for this. The letter was sent over a year after those children had been removed from the home. There was no quasi-prosecutorial circumstances taking place. This was not critical to some judicial process. These two social workers took it upon themselves. The point is you have no obligation. And if you look at Rooker v. Feldman, I don't know that we even have jurisdiction. What does that mean? Mr. Gaskin is going to speak to us to that, but we believe that we do, that this is we are bringing in these claims de novo and that we're reframing this. Do you want to save a minute for rebuttal? I would like to, please. All right. Thank you very much. May it please the Court, good morning, Your Honors. My name is Melissa Kenioklis, and I represent the county appellees. Pull the microphone down just a little bit so we can hear you. That's it. Thank you. Is that better? Yes, that's better. Again, Melissa Kenioklis, I represent the county appellees. And at the council table are John Devine, who represents the judicial appellees, and Cheryl Feiner, who represents the state appellees. And we have agreed to divide our allotted time equally and to speak in order of introduction unless this Court would like a different arrangement. I want to go right into when this letter was sent. This letter from Barbara Eddy was sent to Kelly Lynn Ma, Mr. Whitman's purported friend and fiancé, after the juvenile court had found the following subsequent to a contested hearing in the dependency court, that Megan and India had been or were at risk of being sexually abused in Mr. Whitman's home, that all four children were not protected while residing in Mr. Whitman's home, and that Mr. Whitman was prohibiting from visiting with Megan and India, and also that Mr. Whitman could only visit with Daniel and Jason once per month and only if the boys wanted to visit with him. That is what the juvenile court found. And as Your Honor made note of earlier, the court is the person who has the authority to determine whether the reunification plan has been satisfied and determine whether to reunite the children with their mother. And in this case, according to Mr. Whitman's own allegations in his original complaint and excerpts of record at pages 206 and 207, alleges that Commissioner McCarthy, during a court hearing, told Barbara Eddy that that letter should be disregarded. So I'm baffled as to how this letter instilled fear in Mr. Whitman to marry his friend and fiancee, Ms. Ma, when he knew, presumably from Ms. Ma or someone else who was present at the hearing, that Commissioner McCarthy was not going to take that letter into consideration in deciding whether to reunify the four children with Ms. Ma. I'd also like to, since I'm limited on time, to move on to the qualified immunity analysis. And as the court has mentioned earlier, there is a two-step analysis. First, did Barbara Eddy's actions in sending the letter to Kelly Lynn Ma violate a constitutional right? That's the first step. And if the answer to that first question is yes, then we're to move on to determine whether the right was clearly established in light of case law in the case-specific context. Well, in this case, there was no constitutional violation of Mr. Whitman's When Barbara Eddy, the social worker on the reunification plan social worker, sent Kelly Lynn Ma a letter indicating that it was not in her best interest for the Ma children to associate with Mr. Whitman. Again, this is after the juvenile court made the findings I mentioned earlier during a contested hearing in the dependency court. Are those findings part of the complaint? They're part of the complaint, and they're also part of the documents that Mr. Whitman had submitted. The particular findings, and part of the documents attached to the complaint were submitted afterwards. Correct. Yes. Yes. So the letter cited these undisputed facts. And so there was no constitutional violation that this letter sent to Kelly Lynn Ma would interfere with Mr. Whitman's right to marry Miss Ma. And as mentioned, this letter would have no impact on Commissioner McCarthy's decision to determine whether to reunify the children of Miss Ma. Well, she says the law. Go ahead. Now, that letter comes after the court has made that adjudication, but before he's been told you can ignore it, right? Your Honor, I apologize. It's not entirely clear from the record when Mr. Whitman was told he could ignore it. I don't even believe that Mr. Whitman was present at the hearing. He alleges in his complaint, though, in his original complaint. The court made its adjudication before that letter went out. Is that true? The court made its adjudication with respect to the facts that I mentioned earlier. But the court also said at some point, I believe according to Mr. Whitman's original complaint, that the letter was sent in July of 2000 and that the hearing was in December of 2000 in the hearing where Commissioner McCarthy said this letter can be disregarded. And according to Mr. Whitman's allegations, Commissioner McCarthy, and, you know, this was a 12B6. We don't have the transcript or any affidavits in the record. But Commissioner McCarthy allegedly said that this letter should be disregarded and admonished social worker Barbara Eddy that the letter was inappropriate. So as of December 2000, the threat of not getting the children back was off the table, according to Mr. Whitman's own allegations in the original complaint. Which paragraphs would I look to to see this? It's on excerpts of record at page 206, line 26. It's on excerpts of record. Page 206, line 26. To page 207, line 2. Yes. I think you're right. I think I do recall that. But I hadn't placed it in context. You're right. I do recall reading that. So the first answer to the qualified immunity, the answer to the first. Well, you know, when you answer that question, the first step under Katz is to ask, assuming the facts are true. Right. Would, you know, for purposes of qualified immunity only, would these amount, would there be a constitutional violation? So you assume that they're true, and then you answer that question. And assuming that the facts, as pled in Mr. Whitman's complaint and as included in the documents in support of his complaint that was filed with the court, the answer to that question is no. There was no constitutional violation by Barbara Eddy sending that letter to Kelly Lynn Ma. But even if this panel is prepared to say that it was a constitutional violation, at least in terms of from July 2000 through December 2000, that time period, let's move on to the second question, which is, was the law clearly established? And the cases cited by Mr. Whitman include Loving v. Virginia and Zablocki, which involved statutes or regulations that directly and substantially interfered with the right to marry. And that's not the case that we don't have a statute here that directly interfered with Mr. Whitman's right to marry. Also, the Ninth Circuit case that he cites to support his argument, Kraft v. Jaca, this court stated that cohabitating couples may fit within the description of an intimate protected association, but the court did not decide whether such a relationship was a protected one. The court concluded further that the right to free association is not absolute and that in some cases this right must give way to a compelling government interest. And I think that it's ‑‑ I'm running low on time. It was fully discussed in our brief the compelling interest that Barbara Eddy in sending that letter to Ms. Ma was thinking of her duties with respect. She is the reunification social worker. Her duties are to ensure that these four children are protected and that before their return to a home that it is a safe environment for him. And the state has a compelling interest in ensuring that those children who have been removed in our involved in dependency proceedings, that they are protected. It's her duty to do that. And so there was no ‑‑ the Kraft case could not have put Barbara Eddy on notice that sending this letter in an effort to protect these children would somehow interfere with Kelly Lynn's ma friend and fiancé's right to marry her. I see that I am ‑‑ I have exceeded my allotted time. So unless the court has further questions, I think I should give the other attorneys at the table an opportunity to speak. Thank you very much. Thank you. Good morning, Your Honors. My name is John Devine. I'm with the California Attorney General's Office, and I represent Judge Edwards and Commissioner McCarthy, both from the Superior Court of California for the County of Santa Clara. I believe the Court correctly identified the standing issues with regard to the claims against Commissioner McCarthy. I did just briefly want to mention the substantial jurisdictional impediments also to maintaining the suit against Commissioner McCarthy. The 11th Amendment prevents suing a state official, a judge in this instance, for any of their actions in an official capacity. The Rooker-Feldman Doctrine precludes any type of collateral attack against a court's decisions or judgments, and in this instance, Mr. Whitman, the event that he now complains about this October 9th hearing, he indicated both at the oral hearing on the motion to dismiss and in his appellate brief that he had taken that decision up with the California Court of Appeal and the California Supreme Court, and those were both summarily denied by those respective courts. Finally, as a jurisdictional impediment is the domestic relations exception, which essentially stands for the proposition that the whole subject of domestic relations is left to the laws of the state, not to the laws of the United States. That was just recently mentioned again by the Supreme Court in the Unified School District versus Newdale where they dismissed that case on those very jurisdictional grounds. Finally, with respect to the immunity issue, I won't belabor that. Judicial immunity, I won't belabor that with this panel, but I think Justice Paez correctly noted that it's axiomatic that a justice controlling his or her own document is a judicial function and therefore entitled to judicial immunity. With the insurmountable jurisdictional barriers, with the applicable immunity provisions, the district court appropriately granted both Judge Edwards and Commissioner McCarthy's motion to dismiss. Thank you. Good morning, and may it please the Court. Cheryl Feiner on behalf of the State Appellees. Since much has been discussed today, I just want to limit my remarks to really two main points. It appears in the current oral argument today, and as well as in the supplemental briefing,  Mr. Whitman does not appear to be pursuing any claims against the state agency as well as the state employees. So I'm happy to answer particular questions as to them, but it appears that according to the oral argument, the two issues that are being discussed and relevant are the denial of access to the court and the right of Mr. Whitman to marry Miss Ma. The only point I would like to make that actually has to do with all of the defendants and the current appellees is that it was brought up in the oral argument that this case should be remanded. I mean, obviously, I believe it should not be remanded as to the state defendants, but that the issue and only purpose of remand would be to have a discovery and a time for change of evidence with regard to this issue of the fact that Mr. Whitman and Miss Ma are too scared to be married. But I would put forward that according to their own supplemental briefing, this issue with regard to fear of reprisal, of getting the children back, is actually moot. Because according to their own supplemental briefing, out of the four children, the baby at the time, India Ma, has been part of a finalized adoption and she's been adopted out. Megan, the daughter, is now living with her father in Georgia, and that child, the mother has terminated her parental rights. Daniel is 18 years old, and my understanding from the briefing is remaining with the foster family, but he is 18. And the last child is Jason, and it's my understanding from the briefing as well, that he is living with Miss Ma and Mr. Whitman. So that the whole idea of remand, so we could have a full discovery as to the issues of why they are not marrying for fear of reprisals, to not getting the children back, is actually moot, because the one child that is available to live with them is in fact living with them, and they're still not getting married. Has the adoption for the younger one been completed? It is my understanding that that was completed some time ago, early on in the proceedings. But since those are not my clients, I can't say for certain. But if you have any other questions, otherwise I would submit on the pleadings. Mr. Devine, I just want to ask you one question, Mr. Devine. I forgot to ask it when you said something, and it's just one question. The Commissioner, you said that the judge is a state employee. Is the Commissioner a state employee? Yes, the Commissioner is a state employee as well. All the judicial officers are. There's a particular statute. That makes Commissioners state officers? State judicial officers, yes, there is. Is that because of the unification that took place between the two? It was even before the unification. It actually, there's a California constitutional provision, and I'm sorry I can't get it off the top of my head right now, but there's a California constitution provision as well as a statute provision saying that Commissioners are state employees. And they receive a state payment, their paycheck from the state. All right. Thank you very much.  We have had a minute of rebuttal. Your Honors, contrary to what Apelli has stated, the letter did in fact have a chilling effect on the relationship between Mr. Whitman and his fiancée. The letter was actually put into the record at a subsequent hearing by Ms. Eddy in December of 2000. So, you know, therefore, Mr. Whitman and Ms. Ma had every reason to continue to fear what actions the social workers would take against them following the entry of this letter into the record. And, indeed, over the course of many months, Mr. Whitman and his fiancée had had to undergo quite a bit of unfortunate circumstances with the Department of Social Services interfering in their relationship. And we, again, just ask that this court remands back to the district court so that there can be full discovery that takes place and Mr. Whitman can have his day in court. As for three of the children, Jason is, indeed, back in the home of Mr. Whitman and Ms. Ma. But for the other three children, India, Mr. Whitman and his fiancée have not been told what her status is. Ms. Ma retains parental rights over Megan, even though she is in Georgia living with her father. And Daniel is of age currently. But this is very much a live matter, and we ask that it be remanded back to the district court. There's obviously quite a bit taking place, and it has taken place, that needs to be fully discovered. Okay. Thank you very much. We appreciate the argument and your willingness to help out. Thank you. Thank you. That completes our calendar for today, and we'll be in ñ we're adjourned for, you know, next month.
judges: Fernandez, Paez, Weiner